# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **REBECCA A. ELSWICK,** | ) | |
| Plaintiff, | ) | Civil Action No. 2:09cv00006 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | By:  GLEN M. WILLIAMS |
| Defendant. | ) | SENIOR UNITED STATES DISTRICT JUDGE |

In this social security case, I will vacate the final decision of the Commissioner denying benefits and remand the case to the Commissioner for further consideration.

### I. Background and Standard of Review

The plaintiff, Rebecca A. Elswick, ("Elswick"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Elswick's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"),  under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.*  (West 2003 & Supp. 2009).  Jurisdiction of this court is pursuant to 42 U.S.C.A. §§ 405(g) and 1383(c)(3).  (West 2003 & Supp. 2009).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards.  *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).  Substantial evidence has been defined as "evidence which a reasoning

mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Elswick protectively filed her applications for DIB and SSI on April 11, 2003, alleging disability as of May, 1, 2002, (Record, ("R."), at 78-80, 250-53), due to severe back pain followed by muscle spasms, severe wrist and feet pain coupled with swelling, nerve problems and anxiety attacks. (R. at 92, 119.) The claims were denied initially and upon reconsideration. (R. at 46-48, 51, 52-54.) Elswick then requested a hearing before an administrative law judge, ("ALJ"). (R. at 55.) A hearing was held on November 19, 2004,[1] at which Elswick was present and represented by counsel. (R. at 454-511.) By decision dated February 22, 2005, the ALJ denied Elswick's claims. (R. at 261-78.) Elswick then requested a review of the ALJ's decision. (R. at 77.) By order dated July 20, 2006, the Appeals Council remanded the case back to the ALJ pursuant to the new and material evidence provisions of the Social Security Administration regulations found at 20 C.F.R. §§ 404.977, 416.1477. (R. at 284-86.) A second ALJ hearing was held on September 18, 2007, at which Elswick was again represented by counsel.[2] (R. at 519-44.)

---

[1] This hearing was originally scheduled for February 27, 2004, but was continued to allow counsel to obtain independent consultative mental and orthopedic evaluations. (R. at 447-53.)
[2] This hearing was originally scheduled for February 14, 2007, but was continued to allow counsel to obtain and submit updated medical records; additionally, the ALJ ordered updated independent consultative physical and mental status evaluations. (R. at 512-18.)

2

By decision dated October 26, 2007, the ALJ denied Elswick's claims. (R. at 19-32.) The ALJ found that Elswick met the insured status requirements of the Act for DIB purposes on the claimed date of disability, May 1, 2002, through at least December 31, 2007. (R. at 25.) The ALJ found that Elswick had not engaged in substantial gainful activity since May 1, 2002, her alleged onset date. (R. at 25.) The ALJ determined that the medical evidence established that Elswick suffered from severe impairments, namely degenerative disc disease, fibromyalgia, obesity, a major depressive disorder and an anxiety disorder with agoraphobia. (R. at 25.) However, the ALJ determined that Elswick did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 27.) The ALJ also found that Elswick had the residual functional capacity to perform light work[3] subject to certain limitations. (R. at 27.) Specifically, the ALJ found that Elswick could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and or/carry items weighing up to 10 pounds, stand and/or walk for six hours in an eight-hour workday and sit for six hours in an eight-hour workday. (R. at 27.) Furthermore, the ALJ found that Elswick could occasionally climb, balance, stoop, kneel, crouch and crawl, and he determined that she could frequently reach. (R. at 27.) In addition, the ALJ found that Elswick's mental condition would limit her to simple, unskilled work and that she would have a moderate limitation in her ability to interact with the public, co-workers and supervisors. (R. at 27.) The ALJ found that Elswick was unable to perform her past relevant work as a bank teller, a jewelry shop clerk and a stock clerk, but that she

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, she also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2009).

Case 2:09-cv-00006-GMW-PMS   Document 16   Filed 10/14/09   Page 3 of 41   Pageid#: 66

could perform her past relevant work as a cashier and a fast-food handler. (R. at 30.)

Based on Elswick's age, education, work experience, residual functional capacity and the testimony of a vocational expert, the ALJ found that there are jobs existing in significant numbers in the national economy that she can perform, including jobs as a food preparer, a laundry worker and a packer. (R. at 32.) Accordingly, the ALJ found that Elswick was not under a disability as defined by the Act and was not entitled to benefits. (R. at 32.) *See* 20 C.F.R. §§ 404.1520(f), (g), 416.920(f), (g) (2009).

After the ALJ issued his decision, Elswick pursued her administrative appeals and sought review of the ALJ's decision, but the Appeals Council denied her request. (R. at 9-12, 15.) Elswick then filed this action seeking review of the ALJ's decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2009). This case is now before the court on Elswick's motion for summary judgment, which was filed July 10, 2009, and on the Commissioner's motion for summary judgment filed on August 10, 2009.

*II. Facts*

4

Elswick was born in 1972, (R. at 78), which classifies her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). According to the record, Elswick graduated from high school. (R. at 98.) She has past relevant work experience as a bank teller, a jewelry shop clerk, a stock clerk, a cashier and a fast food handler. (R. at 93.)

At the hearing before the ALJ on November 19, 2004, Elswick testified that she had not worked in over two years. (R. at 459.) She testified that she was last employed as a bank teller, (R. at 459), from April 2001 to May 2002. (R. at 462.) The job required her to handle money and be on her feet the majority of the day. (R. at 459.) She further testified that she was required to carry bags of money, including coins, "a couple of feet or so" about once a week. (R. 459-60.) Additionally, when freight was delivered "once or twice a week" she was required to help unload it. (R. at 461.) Elswick stated that the job required the use of computers and other office equipment; adding that she was trained to use the bank's specific computer, but not computers in general. (R. at 461.)

Elswick testified that her health problems started approximately six months after she began working at the bank. (R. at 462.) She testified that she began to experience constant back pain and nervousness, explaining that she could not handle dealing with customers. (R. at 462.) She further testified that nothing specific triggered the problems; instead, they just occurred and gradually worsened. (R. at 462.) When questioned about her difficulty dealing with the public, Elswick testified that she experienced anxiety attacks when exposed to large groups of people or people

5

she did not know. (R. at 462-63.) Elswick stated that she experienced such attacks "once or twice" during her employment with the bank. (R. at 463.) She did not miss any work at the bank because of her problems, nor did her supervisor make any accommodations. (R. at 463.) Elswick testified that even though she was no longer working, she was still experiencing anxiety attacks one to three times a week. (R. at 463.) She indicated that, at the time of the hearing, she was taking medication to deal with her anxiety attacks, but explained that the attacks still occurred. (R. at 464.)

Upon questioning by the ALJ, Elswick said that she continued to work at the bank until two days before she gave birth to her daughter. (R. at 465.) The ALJ inquired as to whether Elswick's decision not to return to work was motivated by the birth of her daughter, to which Elswick replied that it was not. (R. at 465.) Upon further questioning from the ALJ, Elswick insisted that she had planned to return to the bank and had made plans for the care of her child once she did so. (R. at 466.)

Elswick testified that she worked at Wal-Mart from October 1997 to April 2001. (R. at 486.) Elswick told the ALJ that she first worked in the clothing department and then transferred to the jewelry department. (R. at 486.) This job, Elswick claimed, required her to stock and pull freight from the back. (R. at 487.) She asserted that some of the boxes were "quite heavy," estimating that they weighed 15 or 20 pounds. (R. at 487.)

Elwick disclosed that she worked at Vansant Lumber from June 1993 to October 1997. (R. at 488-89.) This position entailed the duties of stocking and working as a sales clerk. (R. at 489.) According to Elswick, the job required her to be

6

on her feet, and she was required to lift and carry heavy items weighing approximately 30-40 pounds. (R. at 489-90.)

From June 1990 to June 1993, Elswick worked as a stocker and cashier at Magic Mart and Sam's Club. (R. at 490.) Both of these jobs required her to stock shelves, as well as perform the job of cashier. (R. at 490.) The items she had to carry at Magic Mart were not very heavy, weighing an estimated five to 10 pounds. (R. at 491.) Elswick stated that the items she carried at Sam's Club were much heavier since they were bulk items. (R. at 490-91.) Elswick indicated that, from 1987 to 1988, she was a fast food worker. (R. at 492.) She stated that this job required her to constantly be on her feet. (R. at 492.) Moreover, when trucks delivered shipments, it was among her responsibilities to help unload them, requiring her to lift 20 to 30 pounds. (R. at 492.)

Elswick testified that she "stay[ed] depressed all the time." (R. at 467.) She described her depression as leaving her with no energy or motivation to do anything. (R. at 467.) Elswick stated that her day was typically spent taking care of her daughter. (R. at 467.) When asked how she was able to take care of her daughter despite lacking motivation to do anything, she responded that she had to do so. (R. at 468.) In response to the ALJ's questioning, Elswick asserted that her ability to care for her daughter had not been questioned by her husband or investigated by Social Services. (R. at 468.) The ALJ inquired as to how Elswick could carry her daughter and change her diapers to which Elswick responded that she had to because she was the only one able to do so. (R. at 469.) Elswick testified that it hurt her to pick up her daughter, and she explained that she could not play with her as much as she would like. (R. at 472.)

7

Elswick testified that her back hurt all the time, noting that certain movements made it worse. (R. at 472.) Elswick stated that she did not have shoes with shoelaces because she could not bend over to tie them. (R. at 472-73.) In response to questioning by her counsel, Elswick claimed that she could not sit more than 30 minutes at a time. (R. at 473.) Elswick went on to say that if she sat longer than 30 minutes her back started hurting, causing pain to shoot into both of her legs. (R. at 473.) Elswick also testified that she could only stand for 30 minutes before the same problems occurred. (R. at 473.) Elswick further stated that when she experienced the pain it caused her to lose her balance. (R. at 474.) Elswick testified that "I get catches in my hips, both of them." (R. at 474.) Elswick alleged that she could only walk for 15 minutes before she had to stop due to the pain in her back and legs. (R. at 474.) Elswick indicated that she required assistance with chores such as bathing her daughter, washing dishes, cooking and cleaning around the house. (R. at 475.) She denied any previous back injury, but she claimed that she was diagnosed with a bulging disc. (R. at 476.)

Elswick stated that her pain and emotional problems prevented her from having a consistent and peaceful sleep pattern. (R. at 475.) Elswick further provided that the disruption of her sleep required her to take a nap during the day. (R. at 475.) Her emotional problems, namely the depression, caused her to have "crying spells" once a day. (R. at 481.) Elswick testified that she treated her various conditions with medications such as Naproxyn, which is a muscle relaxer; Ativan for anxiety; Remeron for depression; Lipitor for cholesterol; and Ultram for pain. (R. at 478.)

8

Additionally, Elswick stated that she took ibuprofen and Tylenol on an as-needed basis.  (R. at 479.)

Elswick explained that the pain interfered with her ability to focus and concentrate.  (R. at 480.)  She stated that she watched television minimally and noted that she only read for her daughter's entertainment.  (R. at 480.)  She declared that she used to enjoy outdoor activities and walking, but was no longer able to participate in such activities.  (R. at 480-81.)  Additionally, Elswick testified that when she raised her arms it hurt her back.  (R. at 482.)  Furthermore, she stated that she could not push or pull frequently due to pain.  (R. at 482.)  Elswick went on to say that her husband drove her because she got too nervous to drive.  (R. at 482.)  She testified that her husband performed the majority of the shopping duties.  (R. at 483.)  Elswick testified that she only took her daughter to the doctor when it was necessary; otherwise, her husband took her daughter to the doctor.  (R. at 485.)  Elswick testified that she handled her household's finances, including paying the bills.   (R. at 494.)  Additionally, she noted that she was able to use the family computer for online banking.  (R. at 495.)  She testified that she did not go to church, out to eat or partake in outside entertainment.  (R. at 494-95.)

James Williams, a vocational expert, also testified at the hearing.  (R. at 496-510.)  Williams classified Elswick's jobs as a bank teller and a jewelry manager as semi-skilled, light work with transferable skills.  (R. at 498.)  Williams classified the job with the lumber company as unskilled, medium work,[4]  the jobs as a cashier as

---

[4] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds.  If an individual can perform medium work, she

9

unskilled, light work with no transferable skills, the job as a sales clerk as semi-skilled, light work with some transferable skills, the job as a stocker as unskilled, medium work with no transferable skills and the job as a fast food worker as unskilled, light work. (R. at 498-500.)

The ALJ then asked Williams to consider a hypothetical individual of the same age, education and past work experience as Elswick, who could occasionally lift and/or carry, including upward pulling, items weighing up to 20 pounds, frequently lift and/or carry, including upward pulling, items weighing up to 10 pounds, stand and/or walk six or more hours in an eight-hour day and sit six or more hours in an eight-hour day. (R. at 500.) The hypothetical individual also would be limited in the ability to push or pull with the upper extremities, eliminating continuous pushing or pulling activities such as overhead work. (R. at 500.) Furthermore, the hypothetical individual could occasionally climb ramps and stairs, never climb ladders, ropes or scaffolds and could occasionally balance, kneel, crouch, crawl, stoop and bend. (R. at 500.) Finally, such a hypothetical individual should avoid exposure to hazards such as unprotected heights and dangerous moving machinery and would miss one or less days of work a month. [5]   (R. at 500-01.)   Considering the aforementioned hypothetical, Williams opined that the hypothetical individual could return to the jobs of a bank teller, a manager of a jewelry department, a sales clerk and a fast-food worker. (R. at 501.) Moreover, if those jobs were unavailable, Williams testified that the individual could perform other unskilled jobs existing in significant numbers in the

---

also can perform light and sedentary work. *See* 20 C.F.R. § 404.1567(c), 416.967(c) (2009).
[5] The transcript indicates that the ALJ was referencing Exhibit TF, however there is no document labeled Exhibit TF in the record.

national economy, including those of a parking lot attendant, retail sales positions, a watch guard or a gate guard, all at the light level of exertion.  (R. at 502.)

The ALJ next asked Williams to consider the mental impairments contained in Exhibit 7F[6].  (R. at 503.)  Williams opined that, with the inclusion of those mental limitations, the hypothetical individual could still perform the duties of an unskilled retail sales job, a fast-food worker engaged in only the preparation of food and a parking lot attendant.  (R. at 504.)  Additionally, Williams believed that this hypothetical individual could work as a laundry worker, a domestic cleaner or a general office clerk, all light, unskilled jobs.  (R. at 504-05.)

The ALJ next asked Williams to consider a hypothetical individual of the same age, education and work experience as Elswick, who had the residual functional capacity listed in Exhibit 4F[7.]  (R. at 505-06.)  Based upon this hypothetical, Williams opined that such an individual could perform sedentary work.[8] (R. at 507.)  As such, every job that had been mentioned would be eliminated.  (R. at 507.)  Next, the ALJ instructed Williams not to consider the physical limitations of Exhibit 4F, only the mental limitations of Exhibit 4F.  (R. at 509.)  Williams testified that no jobs would be available.  (R. at 510.)

---

[6] Exhibit 7F contains the findings from a consultative examination performed by Ellie Sturgis, Ph.D.  (R. at 204-13.)
[7] Exhibit 4F contains the findings from a Medical Assessment Of Ability To Do Work-Related Activities completed by Dr. Michael H. Clary, D.O.  (R. at 179-82.)
[8] Sedentary work involves lifting items weighing up to 10 pounds at a time with occasional lifting or carrying of articles like docket files, ledgers and small tools. *See* 20 C.F.R. 404.1567(a), 416.967(a) (2009).

11

Following an order of remand, a second ALJ hearing was held on September 18, 2007.  (R. at 519-44.)  Elswick testified that she had not worked since the previous hearing, nor had her conditions improved.  (R. at 523-24.)  Elswick testified that in response to her doctor's challenge to get out of the house more, she attempted to go to a restaurant with her family.  (R. at 525.)  However, the trip was not successful as she became nervous, sick and had problems breathing.  (R. 525.)  Elswick also testified that she no longer took her daughter to school, but while she was in preschool she would take her back and forth.  (R. at 525-26.)

John Newman, a vocational expert, also was present and testified at the hearing. (R. at 529-41.)  Newman agreed with the previous classifications of Elswick's work history as provided by Williams.  (R. at 530.)  The ALJ asked Newman to consider a hypothetical individual of Elswick's age, education and past work experience who had the limitations identified in Exhibit 19F[9].  (R. at 531-32.)  Newman found that such limitations would preclude all full-time work.  (R. at 531.)  Also, when considering the limitations in Exhibit 18F,[10] Newman opined that all full-time employment would be eliminated.  (R. at 532.)  Newman also testified that the limitations in Exhibit 15F[11] would preclude all full-time work.  (R. at 532-33.)

_____

[9] Exhibit 19F contains the Medical Assessment Of Ability To Do Work-Related Activities (Physical), completed by Dr. Kenneth  Jones, M.D. (R. at 358-59.)
[10] Exhibit 18F is a Medical Assessment Of Ability To Do Work-Related Activities (Mental), completed by Joseph H. McVoy, Ph.D. (R. at 356-357.)
[11] Exhibit 15F is a Medical Assessment Of Ability To Do Work-Related Activities (Mental) from Christiansburg Family Practice, completed by Dr. Jones.  (R. at 320-21.)

Newman was then asked to consider a hypothetical individual of Elswick's age, education and past work experience with the limitations expressed in Exhibit 23F.[12] (R. at 533.) Newman was of the opinion that the jobs previously described by Williams could still be performed. (R. at 533.) Newman also opined that the same individual, but who was moderately impaired in her ability to understand, remember and carry out short, simple instructions, as well as detailed instructions, to make judgments on simple, work-related decisions, to interact appropriately with the public and with co-workers and supervisors, to respond appropriately to work pressures in a usual work setting and to respond appropriately to changes in a routine work setting, could perform the duties of a food preparation worker, a laundry worker and a packer. (R. at 535.) The ALJ then asked Newman to consider a hypothetical individual of Elswick's age, education and prior work history with the limitations identified in Exhibit 4F. (R. at 535.) Under this hypothetical, Newman concluded that all full-time work would be precluded. (R at 536.)

In rendering his decision, the ALJ reviewed records from Dr. Michael Clary, D.O.; Dr. Joseph Duckwall, M.D., a state agency physician; Hugh Tenison, Ph.D., a state agency psychologist; Elizabeth B. Shumate, LCSW, QSAP; Christiansburg Family Practice; Ellie Sturgis, Ph.D.; Dr. William Humphries, M.D.; Professional Therapies of Roanoke; Carilion Roanoke Memorial Hospital, ("CRMH"), Rheumatology Clinic; CRMH; Joseph McVoy, Ph.D.; Dr. Kenneth Jones, M.D.; Mark S. Perez-Lopez, Ph.D.; and Dr. Chris Newell, M.D.

---

[12] Exhibit 23 F contains the findings of a consultative examination performed by Dr. Chris Newell, M.D. on May 5, 2007. (R. at 382-92.)

13

Elswick first complained of her back pain at Christiansburg Family Practice, ("CFP"), on December 9, 2002. (R. at 152.) Elswick presented to A. Faye Lyons, R.N., F.N.P., reporting that her back "catches when she gets up." (R. at 152.) She claimed to have tremendous back pain and problems with her left wrist, while denying any current or previous injury to these areas. (R. at 152.) Elswick claimed that the pain did not radiate to her legs. (R. at 152.) X-rays of the back and wrist did not show any fractures or other abnormalities. (R. at 152.) However, Lyons noted that Elswick's lower back did show decreased lordosis, indicating muscle spasms. (R. at 152.) Lyons diagnosed a low back strain and left wrist tendonitis, and Elswick was prescribed Relafen and Skelaxin. (R. at 152.)

Elswick returned to CFP on August 2, 2003, where she saw Dr. Michael Clary, D.O., and reported nerve problems. (R. at 151.) Elswick also reported constant worrying, problems with concentration and sleep, fatigue and depression. (R. at 151.) Dr. Clary diagnosed Elswick with anxiety with mild depression, for which he prescribed Paxil. (R. at 151.) In an Attending Physician's Statement, Dr. Clary diagnosed Elswick with a lumbar sprain and lumbar disc disease. (R. at 194-95.) Furthermore, Dr. Clary opined that Elswick was unable to work at her regular occupation due to her conditions. (R. at 195.) On a return visit on December 16, 2003, Dr. Clary diagnosed Elswick with a lower back strain, somatic dysfunction of the thoracic and lumbar spine and continued anxiety and depression. (R. at 200.)

On February 10, 2004, Elswick presented to Dr. Clary with worsened back pain. (R. at 198.) Elswick reported no change in her anxiety and depression, and she indicated that social phobia prevented her from even shopping. (R. at 198.) Elswick also reported feelings of anxiousness and panic. (R. at 198.) Dr. Clary opined that

14

she suffered from depression and anxiety, and he stated the need to rule out lumbar disc disease. (R. at 198.) Dr. Clary prescribed Ultram for pain, recommended that Elswick stretch daily, take warm soaks and decrease her weight. (R. at 198.)

On February 10, 2004, Dr. Clary completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental), in which he found Elswick's ability to use judgment, to relate predictably in social situations and to demonstrate reliability to be fair; her ability to deal with public, to interact with supervisors, to deal with work stresses and to maintain attention and concentration to be poor/none. (R. at 179-80.) Dr. Clary opined that Elswick's ability to follow work rules, to relate to co-workers, and to function independently was "good." (R. at 179). Also, Dr. Clary found that Elswick's ability to understand, remember and carry out complex, detailed and simple job instructions was unlimited/very good. (R. at 180).

Dr. Clary also completed a Medical Assessment Of Ability To Do Work-Related Activities (Physical) on February 10, 2004. (R. at 181-82). Dr. Clary found that Elswick could occasionally lift and/or carry items weighing up to 20 pounds and frequently lift and/or carry items weighing up to 10 pounds. (R. at 181.) Dr. Clary opined that Elswick could stand and/or walk for two hours out of an eight-hour work day, while being able to do so continuously for only 30 minutes. (R. at 181.) Dr. Clary found that Elswick could sit for seven hours out of an eight-hour workday, but for only 30 minutes without interruption, if she was permitted to "get up and down." (R. at 181.) Dr. Clary additionally found that Elswick could never climb, stoop, kneel, balance, or crouch and could occasionally crawl. (R. at 182.) Moreover, Dr. Clary opined that Elswick's ability to reach, push and pull were affected by her condition.

15

(R. at 182.) Dr. Clary also noted environmental restrictions such as avoiding temperature extremes and vibration. (R. at 182.)

Magnetic resonance imaging, ("MRI"), results from February 17, 2004, revealed L4-L5 and L5-S1 disc disease with posterior annular fiber tearing and mild disc bulging. (R. at 196.) On May 13, 2004, Elswick returned to CFP, and presented to Dr. Kenneth E. Jones, M.D., reporting chronic low back pain, partially relieved by Voltaren, left ankle pain and occasional finger pain. (R. at 238.) Elswick continued to report stress and anxiety. (R. at 238.) Dr. Jones found Elswick to be pleasant, but noted that she appeared anxious and stressed. (R. at 238.) Dr. Jones reported that Elswick's back pain could be caused or exacerbated by her stress and that she "obviously ha[d] some underlying significant emotional problems and social phobias." (R. at 238.) Dr. Jones prescribed Zoloft and Valium to treat her back pain and anxiety. (R. at 238.) Elswick continued on with similar visits and reports through August 2007, (R. at 444-45), and in July 2005 was diagnosed with fibromyalgia. (R. at 327.) Additionally, during an assessment in January 2007, Dr. Jones noted that Elswick possibly suffered from restless leg syndrome. (R. at 439.)

On March 21, 2005, and January 17, 2007, Dr. Jones completed a Medical Assessment Of Ability To Do Work-Related Activities (Physical), finding that Elswick could occasionally and frequently lift items weighing up to 10 pounds and could sit, stand and/or walk for one hour out of an eight-hour workday with less than one hour of that time being without interruption. (R. at 318-19, 358-59.) Additionally, Dr. Jones found that Elswick could never climb, stoop, kneel or crawl, but could occasionally crouch and frequently balance. (R. at 319, 359.) Also, Dr.

16

Jones determined that Elswick's ability to reach, to handle, to feel, to push and to pull would be affected by her impairments. (R. at 319, 359.) No visual, communicative or environmental restrictions were noted. (R. at 319, 359).

On March 21, 2005, Dr. Jones also completed a Medical Assessment of Ability To Do Work-Related Activities (Mental), in which he found Elswick's ability to deal with work stress, to function independently, to maintain attention and concentration, to understand, remember and carry out complex and detailed job instructions and to demonstrate reliability to be poor/none. (R. at 320-21.) With respect to Elswick's ability to relate to co-workers, Dr. Jones noted that Elswick suffered anxiety attacks around groups of people. (R. at 320.) With respect to Elswick's ability to understand, remember and carry out simple job instructions, to relate predictably in social situations and to behave in an emotionally stable manner, Dr. Jones rated Elswick as fair. (R. at 321.) Dr. Jones found that Elswick's ability to maintain personal appearance was "good." (R. at 321).

On November 4, 2003, a state agency physician, Dr. F. Joseph Duckwall, M.D., found that none of Elswick's conditions, alone or in combination, represented a severe impairment to work. (R. at 164.) Dr. Surrusco's finding was reviewed and affirmed by Dr. Richard M. Surruco, M.D., another state agency physician. (R. at 164.)

On November 5, 2003, Hugh Tenison, Ph.D, a state agency psychologist, completed a Psychiatric Review Technique form ("PRTF"), which revealed no severe impairment. (R. at 165-77.) Specifically, Tenison opined that Elswick suffered from a non-severe affective disorder and a non-severe anxiety-related disorder. (R. at 168,

17

170.)  Tenison noted that Elswick had mild difficulty maintaining concentration, persistence or pace, but noted no additional limitations.  (R. 175.)  While Tenison found that Elswick's complaints were partially credible, he noted that she had not received mental health treatment for her conditions and that her activities of daily living did not appear to be significantly limited by mental symptoms.  (R. at 177.)

Elswick was treated by Elizabeth Shumate, LCSW, from December 3, 2003, to June 17, 2004.  (R. at 183-92, 224-33.)  On December 3, 2003, Elswick informed Shumate that she had been taking Paxil for about two months with no improvement.  (R. at 189.)  Shumate identified the presenting problems as: serious anxiety, behavior problems, chronic pain, concentration/attention problems, severe depression, moderately easily agitated, fear of others, mild helplessness, moderate hopelessness, worthlessness feelings, moderate irritable mood, mood swings, severe sleep disturbance and panic attacks.  (R. at 189.)  Shumate diagnosed anxiety disorder, not otherwise specified, and she assessed Elswick with a then current Global Assessment of Functioning ("GAF") score of 60.[13]  (R. at 189.)  Elswick informed Shumate on January 6, 2004, that she wished to discontinue treatment.  (R. at 186.)  Treatment was reinitiated on February 5, 2004, at which time Elswick reported increased anxiety attacks despite no additional stressors.   (R. at 183.)   Her diagnosis remained unchanged, and she was continued on Paxil.  (R. at 183-84.)

---

[13] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 51-60 indicates "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning ...." DSM-IV at 32.

18

On March 31, 2004, Elswick again chose to discontinue her treatment, and it was noted that she had not been in treatment long enough to make an adequate assessment of progress toward meeting goals. (R. at 231-32.) However, on April 22, 2004, Elswick contacted Shumate stating that she wanted to continue treatment because she was suffering more frequent and intense panic attacks. (R. at 229-30.) She was again diagnosed with anxiety disorder, not otherwise specified, and she was continued on Paxil. (R. 229-30.) On June 17, 2004, Shumate discharged Elswick from treatment citing that "client has not been compliant with treatment. She has remained in treatment long enough to apply for disability but has not continued working in treatment to resolve any of her issues. She missed her last appointment [scheduled for May 6, 2004,] and has not contacted this office to reschedule." (R. at 225-26.)

Elswick presented to Ellie Sturgis, Ph.D., for a consultative psychological examination on May 25, 2004. (R. at 204-10.) Elswick reported back pain, nerve problems, anxiety attacks, difficulty thinking and difficulty concentrating. (R. at 204.) Following a mental status examination, Sturgis noted that Elswick was oriented in all spheres. (R. at 206). The examination performed by Sturgis revealed that Elswick had some difficulty with memory, and she endorsed symptoms of depression and anxiety. (R. at 206-07.) Sturgis reported that Elswick's judgment and insight appeared to be good. (R. at 206.)

Additionally, Sturgis administered the Minnesota Multiphasic Personality Inventory-Second Edition test, ("MMPI-2"). (R. at 204, 207-08). The results of the MMPI-2 revealed that Elswick was moody, dissatisfied, restless and self-critical. (R.

19

at 207.)  The Content scales showed elevations on the anxiety, health concerns, low self-esteem, social discomfort, work and appearance scales.  (R. at 207.)  Sturgis also noted that Elswick "worries excessively about her health."  (R. at 207.)  Furthermore, Sturgis noted that Elswick chose to isolate herself and avoid interactions with others. (R. at 207.)

Sturgis found that Elswick had no difficulty remembering location and simple work procedures; she could understand, remember and carry out short, simple instructions without difficulty; she had more difficulty understanding, remembering and carrying out complex instructions because of her anxiety and showed moderate impairment in that area; her ability to maintain attention and concentration was moderately impaired secondary to anxiety; she had been punctual and able to work regularly within a schedule, but this likely would show diminution due to anxiety; she was able to sustain an ordinary routine without supervision, but required frequent rest periods; her ability to work with others without being distracted by them was not impaired; she had difficulty making decisions which might affect her ability to work; her ability to interact with public, supervisors, and co-workers was likely to be moderately impaired by anxiety; she would have great difficulty working in high-pressure situations; she would have difficulty responding to change and she should be able to manage her funds in her best interest.  (R. at 208-09.)  Sturgis assessed Elswick's then current GAF score as of 55.  (R. at 209.)  Elswick was diagnosed with a panic disorder with agoraphobia and a mood disorder, not otherwise specified.  (R. at 209.)

Sturgis completed a Medical Source Statement Of Ability To Do Work-Related Activities (Mental) on July 19, 2004. (R. at 211-13.) Sturgis found that Elswick was mildly limited in her ability to perform activities within a schedule, maintain regular attendance and be punctual, to sustain an ordinary routine without special supervision, to work with or near others without being distracted by them, to make simple work-related decisions, to complete a normal workday or workweek, to respond appropriately to work pressures in a normal work setting and to respond appropriately to changes in a routine work setting. (R. at 211-12.) Sturgis also found that Elswick was moderately limited in her ability to understand, remember and carry out detailed or complex instructions, to maintain attention and concentration for extended periods and to interact appropriately with the public, with supervisors and with co-workers. (R. at 211-12.) Sturgis found that Elswick had suffered from psychological symptoms for two years. (R. at 213.)

On September 23, 2004, Dr. William Humphries, M.D., performed a consultative examination. (R. at 214-19.) Elswick indicated that she had experienced severe low back pain for approximately four years. (R. at 214.) The examination revealed that Elswick's back range of motion was severely limited due to pain, and the straight leg raise test caused back pain at 80 degrees bilaterally. (R. at 215.) Elswick's examination did not show radiculopathy, but it did show moderate to severe tenderness of the paraspinous muscles of the lower cervical, entire thoracic and of the bilateral lumbar spine areas. (R. at 215.) Additionally, the lower extremity joint range of motion was reduced due to severe low back pain. (R. at 215.) Elswick's gait was within normal, but she walked in a "rather stiff fashion." (R. at 216.) Elswick could bear weight on both legs, there was no muscle wasting and strength was normal

21

in the four extremities. (R. at 216.) Dr. Humphries diagnosed Elswick with chronic back pain/strain without evidence of radiculopathy and chronic myalgias in the upper, middle and lower back of an unknown etiology. (R. at 216.)

Further, Dr. Humphries found that Elswick would be limited to sitting, standing, and walking six hours in an eight-hour workday and lifting items weighing up to 25 pounds occasionally and items weighing up to 10 pounds frequently. (R. at 216-17.) Additionally, Dr. Humphries opined that Elswick would be limited to occasional stooping, crouching, crawling, climbing and kneeling. (R. at 217.)

Also, on September 23, 2004, Dr. Humphries completed a Medical Source Statement Of Ability To Do Work-Related Activities (Physical). (R. at 220-23.) Dr. Humphries found that Elswick could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds and sit, stand and/or walk for six hours or more out of the typical eight-hour workday. (R. at 220-21.) He also opined that Elswick could never climb and could not engage in continuous pushing and pulling or overhead work. (R. at 221.) He found that she could occasionally balance, kneel, crouch, crawl, stoop and bend. (R. at 221.) Additionally, Dr. Humphries opined that Elswick could reach occasionally and was unlimited in handling, fingering and feeling objects. (R. at 222.) Finally, Dr. Humphries found that Elswick was limited from working around hazards and would miss an average of one day or less a month. (R. at 223.) No visual or communicative limitations were noted. (R. at 222.)

Elswick presented to Professional Therapies of Roanoke on August 10, 2004, and was seen by Heather Davis, P.T. (R. at 234.) At this appointment, Davis compiled progress goals for Elswick, including: Elswick being able to perform daily activities, decrease pain, increase rotation and be able to stand and walk for 30 minutes without pain. (R. at 234.) The treatment was to occur three times a week until the goals were met. (R. at 234.) Elswick attended the sessions on August 10, 13 and 20, and cancelled on August 17, 18, 24 and 27 of 2004. (R. at 236.) Eventually, Davis noted that Elswick felt that a referral to a rheumatologist would be appropriate, and she gave a report to Dr. Jones. (R. at 236.) In her progress notes, Davis noted that Elswick exhibited "exaggerated pain behaviors" and made nonspecific complaints of pain. (R. at 246.) Davis opined that Elswick would benefit from continued short-term rehab to improve pain management and strength. (R. at 246.) In the discharge notes, Davis noted that Elswick rated her pain at a four on a 10-point scale, with the worst pain having been an eight. (R. at 246). Elswick had reported to Davis that her pain was mainly in her lower back, but that it also was in her shoulders, legs and arms. (R. at 246.) Also, Elswick reported that sitting for more than 20 or 30 minutes, or picking up her daughter, aggravated her pain. (R. at 246.)

Elswick was referred by Dr. Jones to CRMH Rheumatology where she was treated by Dr. John W. Pendleton, M.D., in February 2005. (R. at 303-08.) Elswick reported to Dr. Pendleton that she suffered from back pain, pain in her sides and numbness and tingling in her legs with no history of injury to the areas. (R. at 305.) She also complained of pain and stiffness in her wrists and shoulders, tender feet when walking and swelling in her ankles. (R. at 305.) The results of lab tests performed by Dr. Pendleton were normal. (R. at 303.) Dr. Pendleton was of the opinion that the lab

23

results showed that her back pain was the result of her fibromyalgia, with some of the pain being the result of early degenerative disc disease. (R. at 303.) Dr. Pendleton suggested that Elswick begin and maintain a regular exercise program, maintain a regular sleep pattern, lose weight, strengthen her abdominal and back muscles and use massage and medication. (R. at 303.)

Elswick also presented to CRMH for treatment and lab work multiple times from February 2005 to April 2007, complaining of back pain; during these visits, it was noted that Elswick suffered from fibromyalgia. (R. at 393-436.) She consistently ranked her overall pain as an eight on a 10-point scale, (R. at 397, 398, 418, 420), with an eight being specifically given to the pain in her back, hips, shoulders, knees and wrist. (R. at 420.) On February 14, 2005, Dr. Pendleton noted that an MRI revealed only degenerative changes and stated that he felt Elswick's lower back pain was the result of fibromyalgia. (R. at 417.) On April 24, 2007, Dr. Robert R. Johnson, M.D., a rheumatologist, treated Elswick at CRMH and observed that she had elevated ESR, anxiety and depression, but that she had no evidence of arthritis. (R. at 396.) Additionally, it was noted that Elswick had sleep disturbance and a lack of aerobic fitness. (R. at 396.) She was prescribed Trazodone. (R. at 396.)

Elswick was also treated at the Cascade Group by Joseph McVoy, Ph.D, from January 3, 2006, to August 2, 2007. (R. at 360-73, 443.) At her initial visit, on January 3, 2006, she stated, "I don't feel that I can handle anything." (R. at 368.) McVoy noted a then-current GAF score of 52. (R. at 368.) Additionally, he found that she had significant anxiety secondary to her pain, causing her to be homebound. (R. at 368.) McVoy diagnosed anxiety with agoraphobia and major depression. (R. at

24

368.)  He planned to treat her individually with cognitive therapy to help with depression and anxiety.  (R. at 368.)  At a subsequent visit on February 21, 2006, McVoy noted that Elswick was focused on her pain, which seemed to predominate all aspects of her life.  (R. at 369.)  McVoy recommended the importance of developing some adult relationships outside the home.  (R. at 369.)  On March 16, 2006, McVoy noted that Elswick showed clear evidence of "intense serious physical pain."  (R. at 370.)  On May 1, 2006, McVoy noted that Elswick's mood had greatly improved, but she reported no change in her pain.  (R. at 371.)  In this meeting, Elswick agreed to try to go to some public places, such as parks, with her daughter.  (R. at 371.)

On May 12, 2006, McVoy completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) form.  (R. at 322-23.)  McVoy assessed Elswick's ability to deal with work stresses and to maintain attention and concentration as poor/none and her ability to function independently, to understand remember and carry out complex job instructions and detailed (but not complex) job instructions as fair.  (R. at 322-23.)  Elswick's ability to follow work rules, to relate to co-workers, to deal with the public, to use judgment with the public, to interact with supervisors, to understand, remember and carry out simple job instructions, to maintain personal appearance, to behave in an emotionally stable manner and to relate predictably in social situations were all assessed as good.  (R. at 322-23.)

On June 5, 2006, McVoy informed Elswick that her anxiety had reached the level of agoraphobia.  (R. at 371.)  Additionally, Elswick disclosed that she had not carried out the assignment of going out in public; the only place she went was to a family member's home to a cookout, only two houses away from her home.  (R. at

25

371.)  They also discussed that her anxiety did not exist before the pain, noting that the more she felt unable to take care of herself, the worse the anxiety became.  (R. at 371.)

After three months without seeing McVoy, Elswick returned on August 16, 2006.  (R. at 372.)  Dr. McVoy opined that very little progress had been made during this time.  (R. at 372.)  She only "got out" once during that time at the insistence of her husband and had not tried again.  (R. at 372.)  McVoy stated that Elswick never took the initiative to follow his suggestions and made excuses for not doing so.  (R. at 372.)  Elswick challenged McVoy's assertion that she was trying.  (R. at 372.)  On October 8, 2006, Elswick exhibited severe pain and difficulty sitting in one place for more than a few seconds.  (R. at 372.)  Elswick stated that she had a breakthrough in that she was taking her daughter to preschool and going into the classroom, which she had never been able to do.  (R. at 372.)  On November 6, 2006, McVoy commented that Elswick remained very frustrated over the disability process, and he explained that her anxiety was less than it had been in the past, but still prevented her from doing certain activities.  (R. at 372.)  On January 8, 2007, Elswick admitted that she was essentially homebound; she told McVoy that she still took her daughter to school, but was finding it more difficult.  (R. at 373.)  He noted additional economic stressors, as well as the death of an aunt.  (R. at 373.)

On January 8, 2007, McVoy completed another Medical Assessment Of Ability To Do Work Related Activities (Mental).  (R. at 356-57.)  McVoy reiterated his findings from May 5, 2006, with the only differences being Elswick's ability to behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability, which decreased from good to fair.  (R. at 357.)  Elswick again

26

saw McVoy for counseling on February 21, 2007, at which time it was noted that she had not made significant new steps in trying to be more independent. (R. at 443.) To this end, McVoy challenged her to go to a fast food restaurant and a grocery store. (R. at 443.)

On April 30, 2007, Elswick was seen by Mark S. Perez-Lopez, Ph.D., a licensed clinical psychologist, for a consultative psychological examination. (R. at 374-78.) Elswick reported feeling down, irritable and anhedonic. (R. at 375.) Elswick additionally alleged feelings of hopelessness, a disturbance of sleeping pattern, depression, anxiety and feeling easily upset and nervous. (R. at 375.) Elswick further told Perez-Lopez that she stayed home due to the fear of experiencing a panic attack or hyperventilating. (R. at 375.) Perez-Lopez noted that Elswick "present[ed] as an anxious and depressed individual who appears most concerned with her ability to manage back pain and anxiety." (R. at 376.)

After administering a Personality Assessment Inventory, ("PAI"), Perez-Lopez found that Elswick displayed clinically significant levels of depression, particularly as it related to physical functioning and overall health. (R. at 376-77.) Her PAI scores were consistent in the Anxiety subscale and Anxiety Related Disorder subscale with clinically significant levels of panic, worry, tension, difficulty relaxing and sleeping, and nervousness. (R. at 377.) Also, clinically significant elevations on the Somatic Complaints subscale reflected preoccupation with physical health as well as endorsement of functional impairment due to one's physical condition; this information reflects a history of physical problems and symptoms. (R. at 377.) Finally, elevations on the Schizophrenia subscale were consistent with people who are

socially withdrawn or isolated, experience numerous interpersonal difficulties and suffer from reduced concentration and confusion. (R. at 377.)

Perez-Lopez found that Elswick appeared to need assistance with improved anxiety management, and he explained that continued pain management and access to health care services may serve to improve her outlook and willingness to maintain employment. (R. at 377.) Perez-Lopez opined that Elswick's reported anxiety and depression appeared to be exacerbated by her pain and problems leaving home. (R. at 377.) Perez-Lopez found that Elswick had a then-current GAF score of 51. (R. at 377.) Perez-Lopez diagnosed Elswick with a major depressive disorder, recurrent, moderate, a panic disorder with agoraphobia, high cholesterol, fibromyalgia, and he noted that Elswick had financial concerns and problems with access to health care. (R. at 377.)

On May 4, 2007, Perez-Lopez completed a Medical Source Statement of Ability To Do Work-Related Activities (Mental). (R. at 379-81.) Perez-Lopez opined that Elswick's ability to carry out, understand and remember short, simple instructions, to carry out, understand and remember detailed instructions and to make judgments on simple work-related decisions were moderately impaired. (R. at 379.) Additionally, Perez-Lopez found that Elswick's ability to interact appropriately with the public, supervisor(s) and co-workers was moderately impaired. (R. at 380.) Lastly, he found that Elswick's ability to respond appropriately to work pressures in a usual work setting and to respond appropriately to changes in a work setting were moderately impaired. (R. at 380.)

On May 5, 2007, Elswick presented for a consultative examination to Dr. Chris Newell, M.D., who performed a consultative examination. (R. at 382-86.) Elswick reported back pain that radiated to her lower extremities, worsened by bending, lifting and standing. (R. at 382-83.) Additionally, Elswick alleged to have pain in her shoulders, neck, arms and legs. (R. at 383.) Elswick claimed that the pain was "slightly better" with heat. (R. at 383.) Dr. Newell observed that Elswick got on and off the examination table unassisted, grimaced in pain, walked slowly but with a normal gait and had normal concentration and memory. (R. at 384.) Dr. Newell found that Elswick had 18/18 trigger points. (R. at 384.) Dr. Newell diagnosed Elswick with fibromyalgia syndrome, depression and generalized anxiety disorder. (R. at 385.)

On the same day, Dr. Newell completed a Medical Source Statement Of Ability To Do Work-Related Activities (Physical). (R. at 388-91.) Dr. Newell found that Elswick could lift and/or carry items weighing up to 20 pounds occasionally, lift and/or carry items weighing up to 10 pounds frequently, sit, stand and/or walk for six or more hours out of an eight-hour workday, that her ability to push and pull was not affected and that she did not require more than the normal work break at every 2 hours. (R. at 389.) Dr. Newell indicated that Elswick could occasionally climb, stoop, bend, balance, kneel, crouch and crawl. (R. at 389.) In Dr. Newell's opinion, Elswick had limited reaching, but could do so frequently. (R. at 390.) Other areas assessed were found to be without limitation. (R. at 390.) Dr. Newell determined that Elswick would need to miss, on average, one day or less of work per month. (R. at 391.)

Elswick saw McVoy on August 2, 2007, at which time she revealed that her family was moving for her husband's job. (R. at 443.) McVoy viewed this as being a positive change that could necessitate her being more active and less isolated. (R. at 443.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2009); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). The process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2009).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the

30

claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2009); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated October 26, 2007, the ALJ denied Elswick's claims. (R. at 19-32.) The ALJ found that Elswick met the insured status requirements of the Act for DIB purpose on the claimed date of disability, May 1, 2002, through at least December 31, 2007. (R. at 25.) The ALJ found that Elswick had not engaged in substantial gainful activity since May 1, 2002, her alleged onset date. (R. at 25.) The ALJ determined that the medical evidence established that Elswick suffered from severe impairments, namely degenerative disc disease, fibromyalgia, obesity, a major depressive disorder and an anxiety disorder with agoraphobia. (R. at 25.) However, the ALJ determined that Elswick did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 27.) The ALJ also found that Elswick had the residual functional capacity to perform light work subject to certain limitations. (R. at 27.) Specifically, the ALJ found that Elswick could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and or/carry items weighing up to 10 pounds, stand and/or walk for six hours in an eight-hour workday and sit for six hours in an eight-hour workday. (R. at 27.) Furthermore, the ALJ found that Elswick could occasionally climb, balance, stoop, kneel, crouch and crawl, and he determined that she could frequently reach. (R. at 27.) In addition, the ALJ found that Elswick's mental condition would limit her to simple, unskilled work and that she would have a

moderate limitation in her ability to interact with the public, co-workers and supervisors. (R. at 27.) The ALJ found that Elswick was unable to perform her past relevant work as a bank teller, a jewelry shop clerk and a stock clerk, but that she could perform her past relevant work as a cashier and a fast-food handler. (R. at 30.) Based on Elswick's age, education, work experience, residual functional capacity and the testimony of a vocational expert, the ALJ found that there are jobs existing in significant numbers in the national economy that she could perform, including jobs as a food preparer, a laundry worker and a packer. (R. at 31.) Accordingly, the ALJ found that Elswick was not under a disability as defined by the Act and was not entitled to benefits. (R. at 32.) *See* 20 C.F.R. §§ 404.1520(f), (g), 416.920(f), (g) (2009).

Elswick argues that the ALJ's decision is not supported by substantial evidence. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 13-21.) Specifically, Elswick contends that the ALJ erred by failing to accord proper weight to the medical opinions of record. (Plaintiff's Brief at 14-20.) In particular, Elswick argues that the opinions of Drs. Clary and Jones, as well as psychologist McVoy, as treating sources, should have been given greater weight, (Plaintiff's Brief at 16-17), yet, the ALJ noted giving no weight to these opinions. (Plaintiff's Brief at 16-18.) Further, Elswick claims that the ALJ erred by failing to properly consider the opinions of consultative examiners, psychologist Sturgis and Dr. Humphries. (Plaintiff's Brief at 19-20.) Finally, Elswick contends that the ALJ failed to explicitly indicate the weight given to all of the relevant evidence. (Plaintiff's Brief at 20-21.)

32

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Specifically, the ALJ must indicate that he has weighed all relevant evidence and must indicate the weight given to this evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). While an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

The court will first address Elswick's claim that the court erred in failing to accord proper weight to the medical records of the treating physicians and psychologist. (Plaintiff's Brief at 14-20.) Elswick claims that these opinions should

have been given greater weight, and the ALJ erred by "according them no weight whatsoever." (Plaintiff's Brief at 16.)

The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain,* 715 F.2d at 869. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2009). However, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)) (per curiam).[14] In fact, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

Dr Clary's findings imposed significant restrictions upon Elswick. (R. 179-82.) Included in Dr. Clary's assessment of Elswick was that her ability to deal with public, to interact with supervisors, to deal with work stresses and to maintain attention and concentration was poor/none. (R. at 179.) Also, Dr. Clary found that Elswick could stand and/or walk for only two hours during a typical eight-hour workday, while only

---

14 *Hunter* was superceded by 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2), which states, in relevant part, as follows:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other

34

being able to do so continuously for 30 minutes, and he found that she could sit for seven hours out of an eight-hour workday, only if she was permitted to "get up and down." (R. at 181.) Dr. Clary additionally found that Elswick could never climb, stoop, kneel, balance or crouch and he determined that she could occasionally crawl. (R. at 182.) Moreover, Dr. Clary opined that Elswick's functions of reaching, pushing and pulling would be affected by her condition. (R. at 182.) Further restrictions imposed by Dr. Clary included environmental limitations such as avoiding temperature extremes and vibration. (R. at 182.)

In rendering his decision, the ALJ noted that "the undersigned gives no weight to his assessment" when referring to the opinions of Drs. Clary and Jones and psychologist McVoy. (R. at 29.) With respect to the opinion of Dr. Clary, the ALJ adopted the discussion from the prior decision on Elswick's case. (R. at 29.) In that decision, the ALJ opined that Dr. Clary's notes and the remainder of the record did not support Dr. Clary's conclusions; thus, the ALJ inferred that Dr. Clary was basing his opinion on Elswick's subjective complaints. (R. at 273.) Explaining this conclusion, the ALJ said, "[t]here is no accompanying narrative report with objective findings (vs. claimant's subjective complaints) and Dr. Clary's own treatment notes, as well as the remainder of the record, do not support such conclusions." (R. at 273.) As such, the ALJ decided to accord them no weight. (R. at 29.)

Dr. Jones, another treating physician, in his most recent findings, found that Elswick could occasionally and frequently lift items weighing up to 10 pounds and could sit, stand and/or walk for one hour out of an eight-hour workday with less than

substantial evidence in [the] case record, we will give it controlling weight.

35

one hour of that time being without interruption.  (R. at 358.)  Additionally, Dr. Jones found that Elswick could never climb, stoop, kneel or crawl, but could occasionally crouch and frequently balance.  (R. at 359.)  Also, Dr. Jones felt that Elswick's abilities to reach, handle, feel, push and pull would be affected by her impairments.  (R. at 359.) Additionally, Dr. Jones rated Elswick's abilities to deal with work stress, to function independently, to maintain attention and concentration, to understand, remember and carry out complex and detailed job instructions and to demonstrate reliability as poor/none.  (R. at 320.)

In regard to the opinion of Dr. Jones, the ALJ once again opined that the conflicting evidence indicated that Dr. Jones's findings were based on subjective complaints.  (R. at 29.)  In fact, the ALJ stated that "Dr. Jones relies heavily upon claimant's subjective complaints."  (R. at 29.)  However, the ALJ did not note the specific circumstances, other than that there was conflicting evidence, that caused him to believe Dr. Jones relied "heavily" upon subjective complaints.  (R. at 29.)

The findings of Drs. Jones and Clary were exceedingly more restrictive than those of Drs. Newell and Humphries.  Drs. Newell and Humphries found that Elswick could sit, stand and/or walk for six hours in an eight-hour workday, (R. at 216, 388-89), as opposed to the one- and two-hour limitations assessed by Drs. Clary and Jones.  (R. at 181, 318.)  Additionally, Drs. Newell and Humphries found that Elswick would be limited to occasional stooping, crouching, crawling and kneeling.  (R. at 221, 389.)  Drs. Jones and Clary determined that Elswick could never engage in such activities.  (R. at 182, 319.)

36

The ALJ also decided to give no weight to McVoy's findings upon the premise that the GAF score given by McVoy was inconsistent with the mental limitations he assigned. (R. at 29.) The ALJ explained that the GAF score of 58 given by McVoy was "indicative of 'moderate' symptoms and limitations from mental impairments." (R. at 29.) McVoy assessed Elswick's abilities to deal with work stresses and to maintain attention and concentration as poor/none. (R. at 322-23.) The ALJ found McVoy's GAF assessment to be in great contrast with what he believed to be "extreme" mental limitations imposed by McVoy. (R. at 29.)

As noted above, the ALJ may assign no weight to the opinions of a treating physician if he explains why the chose to do so and the record supports such a finding. *See Craig*, 76 F.3d at 590. Here, the ALJ adequately explained his reasoning for not according great weight to the opinions of treating sources. It was the belief of the ALJ, based upon the evidence and logical conclusions, that the treating sources were influenced too greatly by Elswick's subjective complaints. Furthermore, as the ALJ noted, the opinion of the treating physicians and psychologist are inconsistent with the other medical evidence of record. For example, the remaining medical evidence and other opinions did not impose such restrictive findings. In addition to the conflicting evidence discussed above, Dr. Surrusco and Dr. Duckwall, state agency physicians, reviewed the notes from the treating physicians and found that none of the conditions alone, or in combination, represented a severe impairment to work. (R. at 164.) Accordingly, the ALJ did not err by according no weight to the opinions of the treating physicians and psychologist.

Next this court will discuss Elswick's claim that the ALJ erred in failing to properly consider the opinions of consultative examiners Dr. Humphries and psychologist Sturgis. (Plaintiff's Brief at 19-20.) Elswick contends that the ALJ erred because Dr. Humphries and Sturgis imposed greater restrictions than the ALJ and, had these opinions been given proper consideration and weight, a finding of disability could have been reached. (Plaintiff's Brief at 19.)

The ALJ stated, while disposing of the opinions of the treating physicians and psychologist, that he "ha[d] given greater weight to the assessments and opinions of the reviewing State agency physicians and psychologists as well as the four (4) independent consultative physicians and psychologists." (R. at 29.) Thus, it can be inferred that the ALJ considered the opinions of Sturgis and Dr. Humphries.

Particularly, the ALJ noted that Dr. Humphries's opinion was "generally consistent" with the opinions of Dr. Newell, of which the ALJ bestowed the most influence, except that Dr. Humphries placed more limitations on Elswick. (R. at 25.) The additional limitations imposed by Dr. Humphries included an inability to climb, an inability to continuously push or pull or perform overhead work, an occasional ability to reach and the need to avoid hazards. (R. at 221-23.) The court presumably disregarded these findings, but did mention and consider them, in lieu of the updated findings of Dr. Newell. Dr. Humphries's examination was conducted on September 23, 2004, while Dr. Newell's examination was completed on May 5, 2007. (R. at 214-23, 389-91.) The ALJ's findings as to the physical abilities and limitations of Elswick mirror those of Dr. Newell. (R. at 27, 389-391.) The ALJ stated that he relied predominantly upon the "updated independent consultative examinations." (R. at 30.)

38

Accordingly, it is implied that the deviation in the physical findings, from the opinion of the ALJ and Dr. Humpries, is due to the ALJ's reliance on the more current findings.

An updated independent consultative psychological examination also was performed by Perez-Lopez on May 4, 2007. (R. at 374-78.) Sturgis's findings were made on July 19, 2004. (R. at 211-213.) As discussed above, the ALJ noted that he gave the most consideration to the updated findings. (R. at 30.) In discussing the opinion of Sturgis, the ALJ noted the diagnoses of Sturgis and that Sturgis determined the claimant would have no greater than moderate limitations in her mental functioning. (R. at 26.) However, the ALJ did not make mention of other limitations noted by Sturgis. (R. at 26.) Notably, the ALJ did not mention Sturgis's finding that Elswick would need frequent rest breaks. (R. at 25-32.) Elswick specifically points out that the vocational expert, Newman, testified that if an individual required frequent rest breaks he or she would be unable to engage in competitive employment. (Plaintiff's Brief at 19.)

As was the case with the physical findings, it can be argued that the ALJ simply substituted Sturgis's findings with those of Perez-Lopez, i.e. the more recent findings. However, although the ALJ notes assigning a great deal of weight to the findings of Perez-Lopez, (R. at 30), and cites those findings when rendering his decision, (R. at 26), he failed to fully follow their direction. The ALJ found that Elswick's mental condition limited her to simple, unskilled work and that she also would have moderate limitations in her abilities to interact with the public, co-workers and supervisors. (R. at 27.) However, as the ALJ cited, (R. at 26), Perez-Lopez also found that Elswick was moderately impaired in her ability to understand or remember simple one- and

39

two-step commands, to perform repetitive work, to understand and remember complex and detailed commands, to concentrate and to handle work-related stressors. (R. at 378.) The ALJ provided no justification for dissecting the findings of Perez-Lopez, whom he admittedly attributed the most deference, and he failed to specifically set forth his reasoning for accepting portions of the opinion and rejecting other portions of it. (R. at 29-30.)

Consequently, I am of the opinion that the findings of the ALJ are not supported by substantial evidence. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co.,* 131 F.3d at 439-40. While it appears that the ALJ did properly consider all evidence, the ALJ did not clearly explain his rationale for making those conclusions and findings, as he inexplicably failed to fully adopt an opinion which he accorded great weight. As such, this case shall be remanded to the Commissioner for further review of Elswick's mental limitations.

## IV. Conclusion

For the foregoing reasons, Elswick's motion for summary judgment will be denied, the Commissioners motion for summary judgment will be denied, the Commissioner's decision denying benefits will be vacated and the case will be remanded to the Commissioner for further consideration consistent with this Memorandum Opinion.

40

An appropriate order will be entered.

**ENTER:** This 14th day of October 2009.

/s/  Glen M. Williams_____
SENIOR UNITED STATES DISTRICT JUDGE